Case number 23-3931 and 23-3932, United States of America v. Ramel Drew. Argument is not to exceed 15 minutes per side. Mr. Surratt for the appellant. Good morning, Your Honors. Marisa Larrick Surratt here on behalf of the appellant Ramel Drew. May it please the Court, I will be reserving three minutes for rebuttal. On behalf of Mr. Ramel Drew, we're asking this Court for multiple forms of relief, most specifically to reverse the judgment against him regarding Count 1A of the 2023 indictment. We are also requesting the Court to remand Mr. Drew's case for resentencing because the 327-month above-guideline sentence in this case was substantially and procedurally unreasonable, most specifically as a result of the two-level firearm enhancement, two-level premises enhancement, and the incorrect calculations of Mr. Drew's criminal history, most specifically that there was no intervening arrest between two offenses listed in his pre-sentence report. In this case, prior to the August 31st, 2021 search warrant executed at the East 89th Street residence, we have 45 days worth of continuous security camera footage. That shows every single time someone went in or out of that residence. And most specifically, what that security camera footage shows is that my client, Mr. Ramel Drew, had not been inside of that residence for 42 days prior to the search. As a result, it is not reasonably foreseeable for Mr. Drew to have known that Mr. Nathaniel Lightfoot, the resident of the lower aspect of the East 89th Street residence, would have firearms inside of that residence. Nathaniel Lightfoot has no prior felony convictions. At trial, there was, I believe, seven firearms found in the house, but only three met the federal definition of a firearm. The rest were collector's items. One firearm was located in the rafters of the basement. Another firearm was located concealed inside of a kitchen cabinet. And the third firearm was located underneath a couch cushion. I don't think it's disputed that my client, Ramel Drew, did not reside there. He did not have any property, personal property, paperwork, any such items at that residence. My client, on any of the security camera footage or through any of the individuals that testified at trial, was never seen with a firearm and was also never seen with any of the co-conspirators possessing a firearm. When it comes to the firearm enhancement, and I believe that the Hammett case is what really kind of distinguishes what the government has to prove, it is a factual analysis. And here, the facts just don't rise to the level of it being actual possession. I don't think the government has ever argued that Mr. Drew possessed a firearm. Constructive possession, I think the jury's verdict as to, or lack thereof, as to count 2A for felon in possession of a firearm, speaks as to that. And when it comes to the reasonable foreseeability of Drew having knowledge of his co-conspirator's conduct, Drew is never seen having conversations with anyone of co-conspirator wise, other than there are two recorded calls out of 11,000. Two on the wiretap. Mr. Drew did not call Devon Fair or Brandon Bryant. These two calls were from Brandon Bryant calling Rommel's Drew, and in those calls there's no drug content. There's no conversation. Can I ask you, because why couldn't he be held liable? You kind of alluded to this, but under a co-conspirator theory of liability. So here, I think because of the facts and the way that they are presented, my client is never seen with any individual that has possessed a firearm. It's a preponderance of the evidence, right? And we review for clear error. We've said in drug conspiracies it's reasonable to assume there'd be firearms. Here they were near the fentanyl, in the house. And so I don't understand why that, at least to find clear errors pretty hard under that circumstance. Well, here when we're looking at the co-conspirator liability with Mr. Lightfoot, who is the resident of that lower level, I would argue that the drugs were not found in close proximity because the drugs were recovered in a backpack, located inside of the washer and dryer. So they were not located in the same location as these other firearms. In addition, I think this case is unique in the fact that Nathaniel Lightfoot was not a prohibited person. So it's not only connecting Drew to the firearms, but it's also connecting Drew to the knowledge that Nathaniel Lightfoot was possessing these firearms in a way that was connected to drug trafficking activity. And I don't think the government has established that Drew had that reasonable foreseeability that Nathaniel Lightfoot, as someone who was not a convicted felon, who, like I said, due to the nature of the firearms that were recovered, was possessing... What do you do with all of our case law that talks about how it's reasonable to... Someone engaged in a drug conspiracy, especially an extensive drug conspiracy, should assume that firearms will exist. And here they did exist. I get that Lightfoot's not a felon, but that's beside the point. You can't possess a firearm in relation to drug trafficking crimes. I mean, that's pretty clear. Well, and I think here it's the fact that Drew had not been inside the residence for 42 days. So to have a reasonable foreseeability as to Nathaniel Lightfoot's actions or inactions, I don't think that there are any facts that establish that Drew would have or should have had knowledge that Mr. Lightfoot had firearms in his residence. I'm sorry to interrupt you. What's interesting about that argument is that argument was in a different premise, obviously, because you're talking about the sentencing was presented to the jury, and the jury rejected it, right? Because it was presented during the trial to the jury. Not as to the firearms because the jury... No, no, no. I get that the firearms are separate. And, in fact, maybe I'll ask the government. You know, your client, there was a hung jury on the firearm count itself. But my point being is the 42-day argument was presented to the jury. I get that you're now... I tried to qualify it. I'm sorry if I wasn't clear that you're now talking about sentencing, not trial. My only point is, is that same argument for the district judge to reject it, I don't see how we say that's clear error when the jury itself rejected it. So with the reasonable foreseeability as to the firearms, that's different than the reasonable foreseeability as to the narcotics located inside of the residence. But they're both... The same gap in time exists is my only point. But if the jury... So specifically with counts 1A and 2A, there was no Pinkerton jury instruction as to count 2A. So the jury did not consider the reasonable foreseeability as to the firearms because that instruction wasn't given, which is part of our argument as to why we argued it was also improper for the Pinkerton instruction to be given as to count 1A because the charge there is possession with intent to distribute. And we still stand by the fact that there was no conspiracy charged in count 1A and that the jury shouldn't even have been given that instruction. Explain to me why it had... I'm not sure I follow that. Maybe I'm misunderstanding your argument. I found that a little confusing. Maybe you can explain it to me. The two indictments were consolidated. He was charged with conspiracy, and he was convicted of conspiracy. Why can't you give a Pinkerton instruction as to... We always... I mean, when I was a district judge, we'd give it to the, what I called the POID count, possession with intent to distribute count, all the time. And with that, I think it's important to look at the two separate indictments, the 2021 indictment and then the 2023 indictment. But they were consolidated for trial. They were consolidated for trial, but they were not consolidated in the fact of there was a separate count of conspiracy in the 2021 indictment. There was no conspiracy charged in the 2023 indictment. And I would still stand by the fact, and this is what I read to the district... I'm sorry to interrupt you again. You agree that our case law is clear. You don't have to have a count of conspiracy to give a Pinkerton instruction. That's correct. And I know that the Ninth Circuit has a different opinion, but I do agree that in this circuit, that is a factor that can be considered, that it's not an end-all be-all, that if there's not a conspiracy charge, that this instruction can't go through. The argument here stands with the fact that these drugs that were recovered from the dryer on August 31st, that it was not reasonably foreseeable actions within the conspiracy charged in the 2021 case for Mr. Drew to know about that on August 31st of 2023 when the search... Was the original charge of conspiracy not spoken of as the overarching charge, what do they call them, long-speaking? Is that not the entirety of the conspiracy? We would argue no, and the reason for that is then why obtain the 2023 indictment? If the 2021 indictment was sufficient... You had different evidence right at a different home? So it was... So more guns, more drugs, all of the evidence pictorial and otherwise, wasn't that an addition that could be charged in accordance with the existing charge of conspiracy? But that's not what was done here. Instead, a second indictment was obtained for the items that were found in that residence. Under your theory, then the case should have just been presented without counts 1 and 1A or 2A presented to the jury because then it would be in an overarching conspiracy. That's not what was alleged here because the 2023 indictment specifically alleged possession with intent to distribute on August 31st. What is the difference between... I get that it was charged in a separate conspiracy, but this... He calls it a POI, I call it a PWID. This PWID happened during the conspiracy period, right? So it did... Just a yes or a no because I have a follow-up for you. So if that's the case, there was nothing to prevent... I mean, the government didn't do this, but there was nothing to prevent them from just superseding and adding the PWID count to the first indictment, right? Yes, but that's not what was done here. They didn't do it, but I guess I don't understand what the difference is because it still would have been a separate count. It's certainly something that happened during the conspiracy period, right? Yes, and to still meet the standard of the Pinkerton instruction, it still has to... A conspiracy has to be established, which obviously we've argued that a conspiracy was not established between my client, Devon Fair, Brandon Bryant, and Nathaniel Lightfoot. There's no communications. There's no of them being seen doing actions together. There's no being seen of my client having communications... But the jury decided otherwise, right? They convicted you of conspiracy, and just back to Judge Davis's point, the first indictment, the 2021, what we're calling the 2021 indictment, actually was returned in 2022 and included February of 22 up to, and then the 2021 indictment was August of 2021. The 2023, I'm sorry, was August of 2021. So assume that is encompassed within the timeframe of the conspiracy, correct? Yes. And so, again, back, once they're consolidated, why does it matter if they're superseding or they're separate if the date... I would agree with you if the dates were until July of 2021 and then the new indictment was August of 2021, but it's till February of 2022. So what I'm not following is why do we care about the procedural mechanism about whether they have two or one once they're consolidated for trial? Well, in this case, with the possession with intent to distribute, it's different than the conspiracy count, and it's different than a jury determining if the conspiracy existed and what my client's involvement in the conspiracy was versus a specific count of possession with intent to distribute. The difference between those two sentences, my client received a 20-year sentence on the 2021 conspiracy case. He received an additional almost eight years on the possession with intent to distribute case. So there is a difference when you look at even the sentences imposed between the conspiracy count of conviction and the possession with intent to distribute. That's eight years difference. And I see my... Let me ask one more question. How do you respond to the concept that's in some of our cases that the sheer quantity of drugs makes it foreseeable that there would be weapons involved? And that was one of the issues that was addressed in Hammock between money and the quantity of drugs. Here, once again, maintaining the position that the drugs here found were not connected to the firearms and that it wasn't reasonably foreseeable for my client to know, having not been inside of that residence for 42 days. And once it... Having been there, I'm just thinking of the facts here. Having been there regularly up to the last 42 days, I can understand that... I can understand there's a real problem with the 42-day gap. I can agree with that. But having been there throughout, having been in photographs selling drugs at that location, having... My understanding of the evidence was that he also manned the drug phone that was tapped by the government, right? No, that actually... So your position is he never used or answered the drug phone that was tapped? Not during the conspiracy, no, Your Honor. Not during the entirety of the conspiracy from the 21 indictment through the 23 time period? That's correct. It was never established at trial that my... That was one of the issues that we actually had with the special agent's testimony at trial is that it was alleged, but there was no drug customer, there was no anyone that provided any testimony that my client, Mr. Rommel Drew, ever manned the drug phone because the drug phones were TT1, 2, and 3, and Mr. Drew's not on either of those wiretapped phone calls. So my client was not manning the drug phone call. The photographs that you are referencing that the government has submitted, they're all from early... Or I apologize, late July, which still establish our time frame of there was not... Mr. Drew was not continuously at the residence. In fact, this is security camera footage where we can say how many people were there. He wasn't there any time after August 8th, even outside of the residence. And during that time, we see other individuals going in and out of that residence. We see other individuals with bags going in and outside of that residence. Okay, I think your time's up. Thank you, Your Honor. May it please the Court, James Lewis, on behalf of the United States. Rommel Drew was part of a fentanyl trafficking conspiracy in Cleveland, and although that conspiracy was large-scale with many members, the evidence against him was straightforward. He and his co-defendants were on video selling drugs out of the same house. He was recorded on two wiretapped phone calls discussing the conspiracy. Is this... Are these wiretaps of what they call the fentanyl? The drug telephone? So I think there was a couple of different telephones. We had a wiretap on two of the co-defendants, Brandon Bryant and Devon Fair. We intercepted during the wire two phone calls between Brandon Bryant, who was another drug dealer, and Rommel Drew. One of those discussed a GPS tracker, another one discussed meeting at another drug house. They were separate from that during the course of the investigation, and we never got a Title III on this, but we learned that Drew and two of the co-defendants, Devon Fair and Lightfoot, had a drug customer phone that they passed around. Drug customers would call that phone, place their order, and then meet them at this East 89th Street house. We never had a Title III on that phone, but we did have, I think, testimony from the agent about that, and we also had testimony from a number of drug customers. I think there was probably four or five of them at least who testified that they would call that phone. One of three people would answer it, including Drew, and then they would go to this house on East 89th Street and be served. So there was a drug phone. It just wasn't that particular phone wasn't the subject of a wiretap. Thank you. So answer the question about foreseeability in this case regarding the firearm enhancement. Why is there foreseeability in this case? Your Honor, there's two. So just to back up, there's two avenues that the district court can find the firearm enhancement applies. One is actual or constructive possession, and I think the court's question is about the second avenue, which is co-conspirator liability under the guidelines. I ask those questions, and you might answer this because it seems to me it's awfully difficult to establish constructive possession for someone who's not been in that home for 42 days before. So that's a tough fact for the government. I'll acknowledge that. That is a tough fact. But I would point out a couple additional facts that might not be apparent, and they are on the record. First is that this house is searched on August 31st of 2021. That's when we find the half kilo of fentanyl, the vacuum sealer, the high-speed money counter, all the drug tools and the guns. Rommel Drew continues to take part in the conspiracy and serve the same customers. So I'd just direct the court to testimony of two witnesses, Kayla Sherman, who was a drug customer. She testified at trial. Her and her partner showed up at this East 89th Street house, bought drugs from Drew on video. And Kayla Sherman testified, I'm paraphrasing here, but that after the house was raided, Drew continued selling her drugs, and I think her testimony was he just asked her to meet him right around the block from that house. So that's Drew continuing to do the same conduct, just kind of avoiding the house. And second is Robert Fisher. Well, the constructive possession is of the weapons in the home, right? Correct, Your Honor. So being in another location, how does that help you? I think the point of that, and this goes into the second one, is another drug customer, Robert Fisher, testified to essentially the same thing, that he continued buying drugs from Drew after the conspiracy or after the police raided this house. And I think that's relevant to the 44-day gap because it shows that Drew did not just cut himself off from this conspiracy a month before the search warrant. I guess your point is, because Judge Stranch asked you about constructive possession, I think she's right, that if he's no longer going to the house, it's harder to show constructive possession. It might work in the conspiracy theory, but it doesn't work in the construct, or at least it gets a lot harder when you have a 44-day gap. So what's your answer to that? Or 42, I'm sorry. So he's selling drugs to Kayla Sherman, one of the same customers, right around the block from this house. So I think what that shows is that he still knows the conspiracy is going on. He might just have been particularly avoiding that house. That's a Pinkerton analysis, not a constructive possession, right? Sure. I think it goes to both, Your Honor. So the fact that somebody is still continuing to sell drugs, like in that same block or right around that house, indicates that they probably knew up until, or at least it's reasonably foreseeable, that there was going to be guns in that house. Let me ask you, just so I understand it, what you're saying is just because you don't show up doesn't mean you don't possess. In other words, if I own a home and I don't go there for three months, I still possess the stuff in there, right? We would say so. Certainly facts could support that. Again, Mr. Drew had a key to the house. He was on video entering it. You don't have him on video entering for 44 days. A lot of stuff can change inside a home in 44 days, particularly when you have other people involved in the sale of drugs in and out. That's a fair point, Your Honor, and what I might say in response to that is I just, this is in part a fact-intensive thing, but I just ask the Court to consider the scope of the drug activity at this house. This was not a house where we found a couple of grams of fentanyl. This was a very significant drug operation. There was a half kilo of fentanyl in the house when we searched it. There were numerous firearms. There was a vacuum sealer. That would, and I think the special agent's testimony would corroborate, that's higher-level drug trafficking. There's a high-speed money counter, and I believe there was a wiretap phone call we played at trial where Devon Fair, one of the co-conspirators in August, was at the East 89th Street house. What's your best case for the sheer quantity of the drugs making it foreseeable to Drew that there would be guns? I think Judge Thapar, I didn't do a letter on this, but I think Judge Thapar just recently issued an opinion last week, United States v. Lamont Brown, and that case involved a lot more drugs. I think it was about 25 kilos of meth, but I know that there was a number of citations in that case to this Court's prior cases. This Court's discussed it, $60,000 worth of drugs by itself, and I believe there's another previous case from this Court indicating $20,000 is enough. Again, this is a fact-intensive thing, and we also have this other evidence that this was a very large-scale operation at this house, high-speed money counter, a vacuum sealer, customers, including Kayla Sherman, testifying to going to that. Do you agree that all goes to the conspiracy theory and not the constructive possession? We're trying to separate them out, and I get that all that goes to conspiracy theory, but that doesn't go to the constructive possession, right? Just so. I think it could. It might be a little less persuasive than the. I don't understand how constructive possession is about being assumed to be in possession. If you were arguing the Pinkerton, if you were arguing his co-conspirators were doing it, then it seemed to me all of these arguments might flow from that, but I just don't see it on the constructive possession. I think the point I was trying to get across is that the large-scale nature of this operation and Drew's continuous involvement in it from well prior to the search warrant, including to months after the search warrant, when he's still serving the same drug customers in the same neighborhood, that indicates that it's continuous and ongoing, and I think our position would be that in that situation, as opposed to a one-off, that would be a factor that could support a constructive possession theory. Again, the court doesn't have to find that constructive possession applies. The district court found alternatively that both applies, and it gave an explanation for why both apply. I hope I answered the court's questions on that. If the court has no other questions, I'll yield my time, but I'm happy to answer any additional questions the court has about the case. I was a little interested in the plea deal. Why wasn't Drew's statement that he had already accepted a plea deal something that the court needed to investigate or explore? Well, Drew's claim, and again, this is a claim that Drew himself made, not his counsel, his claim that he accepted a plea deal in an August pretrial that was on the record reported by a court reporter, it's just flatly contradicted by the transcript. The transcript, the court can look at it from August of 2022, shows that the court conducted a fried colloquy with Drew's previous counsel. His previous counsel indicated that Drew had considered a plea, wanted to continue considering it. There's nothing in that transcript at all to indicate Drew had accepted a plea, and so there's just the record shows that he did not accept the plea. The court can look at the transcript. Is there any responsibility, in your understanding, for the court to look into or question a defendant who says, I want to plead guilty, I've already pled guilty? Is there not something incumbent on the court to explore or follow up with that defendant? I agree with you, you're right on the transcript. The counsel did say, I gave it to him, and he rejected it. But he's standing there now saying, yes, I want a plea. Actually, I've already agreed to a plea. And I think the answer was, I don't want to hear anything about that. I think what the judge said, and again, it's the same judge who's had the case, he's familiar with it. I would assume he remembered the pretrial. I think what he said is that if you would have accepted it, or if you would have pled guilty, I would have accepted your plea. So I think the court can take that to mean that the judge remembered that pretrial and remembered that the defendant did not accept the plea. And indeed, it would be almost unheard of for someone to plead guilty in August and then suddenly be there for a final pretrial in December. Can I ask a different question about that? Because at the August pretrial hearing, the judge said that day was the cutoff for accepting a plea. But then why was it... I mean, what happened that he allowed him another chance? Why was there an additional cutoff, he mentions, at the December hearing? You know, I think that's probably something that's just in the judge's discretion. I do remember we were set for trial in November, and it got continued for a number of reasons. And the court... My recollection is that one of the co-defendants had asked to reopen the plea because we had six people going to trial in November. Subsequently, four of them pled guilty. And the judge, I think, had the discretion to reopen that. Four of those six ultimately pled guilty. So I think the answer is that's probably something in the district judge's discretion about whether to... I definitely agree it's within his discretion. I was just curious because it just... When you're reading through, there's no explanation for why all of a sudden he can have another chance. I just wanted to understand. There may not be an explanation, but we would submit that's certainly something that went to everyone's benefit, including Mr. Drew. He ultimately chose not to plead, but four of his co-defendants did choose to plea in that time. So I'm not sure there's any complaint about their rights being prejudiced. Certainly the government wasn't objecting to that. Is there any concern, or how would you respond to the concern that he went to trial with a new attorney in a very short time frame? I know the statement was that this is not a complex case, but it was, in fact, a fairly large conspiracy, and there were a lot of people involved, and there was a lot of tape to view and to listen to for a new counsel. How many days was it? Forty-five? I believe Ms. Surratt was appointed... It was toward the end of January, and the trial had been set. So she accepted the CJA appointment at the end of January, and trial was set sometime in March. So it was, I think, 40 days might be... I don't remember the exact amount. But my response to that is, first of all, I'd encourage the court to look at the district court's explanation on this. It's an abuse of discretion standard, and the district court gave a very detailed, in our view, explanation on it. But just to put some of the evidence here in context, I think I touched on this in my opening, but this was a large conspiracy, but just to break down the evidence against Drew, it was fairly straightforward. I went back and counted our trial exhibits. There was about 25 video clips of Ramel Drew selling drugs out of the house. And on that point, I'd just like to clarify, the video went back 45 days, but it was not running 24-7. The video was motion-activated at the house. And so the video would turn on. It appeared when someone was there. It would record for some period of time and then turn off. So it wasn't 24-7 of video. It was like snippets of video. And in addition to that, we provided the agents. Do you know the total time of video combined? I do not know, Your Honor. But the agents went and put together a spreadsheet. So they watched all the video clips, and they made a spreadsheet that basically logged what happened in every video clip, date, time, description. And we provided that to all defense counsel sort of as a way to start sorting through it. And also when Ms. Surratt entered the case, we had already been ready for trial. This was continued on the morning of trial in November. All our trial exhibits are marked, so that is something that's a little bit unusual. Oftentimes, trial exhibits don't get marked until the week before, so they were already sort of prepackaged, ready to go. As far as the wiretap calls, there were a lot of them. Drew was only on two of them, and they were both very short. I think one was under a minute, one was just a couple minutes. And then the rest of it was just fairly straightforward evidence, a search warrant with photos, a couple of drug buyers who testified, and a controlled buy. So it's a large conspiracy, but the evidence against Drew was fairly straightforward in terms of a drug case. And this Court has also talked about that, and I see my time is up. You can finish your sentence. Thank you, Your Honor. We have the benefit of the trial record to evaluate what prejudice there was and how counsel did at trial, and we would submit that Mr. Drew received adequate representation at trial. So for those reasons, we will ask the Court to affirm. Thank you. Thank you, Your Honors. To address some of the points that were just addressed with AUSA Lewis, I think any reference to any activity that occurred at the residence or outside the residence after August 31st when the guns were taken from the residence I don't think supports any constructive possession from my client. In addition, this is not a case where Mr. Drew owned a home and maybe just hadn't gone inside of it for a month or two. This was Nathaniel Lightfoot's residence. There was actually a whole other individual that lived and resided or had possession of the upstairs residence, and then there was also a basement inside of the home. So this is not a situation where Drew owned this residence or had possessory control. And here, de facto control requires something more than just the act of distribution from the premises. And one of the other factors that can be controlling, supervising, maintaining continuity at the location, and that doesn't exist here. My client being outside of the residence a few weeks before the search happened and having not been inside the residence I think shows the fact that he didn't have control and it was not reasonably foreseeable for him to know what Nathaniel Lightfoot would have inside of that residence. Another thing that was not addressed originally but I think is important here is the intervening arrest, which is the Rogers case is what we rely upon a lot here. It's a factual determination, and it resulted in three additional criminal history points that we believe should not have been attributable to Drew. Drew was not arrested. He was not placed in handcuffs. He was not taken to a police station. He was not incarcerated. So I think that distinguishes him from Rogers, and Rogers, the defendant, was taken into custody and there was dispute over when he was charged or how he was charged. The court ultimately relied on records that showed an intervening arrest and an overnight stay. Wasn't it March 5 to March 6? Didn't he, in fact, go out and get or both sides provide varying records? But the court relied on a record that indicated there had been an arrest. So the court relied upon a one-page Cleveland Police Department arrest report that used the word arrest, but it was, I think, definitively proven that Mr. Drew was never taken into custody, and I don't think that's what counsel argued for the government, that he was physically taken to a jail. But did he stay overnight? No, he did not. I confirmed that. I thought the report said that he, March 5, and was released March 6. No, the exact report said, I believe, straight released from the scene, so there was never an argument ever made that Mr. Drew spent one minute in a jail or facility, which I actually personally confirmed, which was discussed on the record, that he never spent one minute in jail. And I don't think this one-page arrest report meets the definition of being able to be under arrest. If anything, it could be a mere seizure under the Fourth Amendment, but it was never established he was placed in handcuffs. He was not given a summons. He was not indicted. He was not taken to jail. He was not taken to county jail or city jail. And we believe that the facts established just by this one-page arrest report that uses the word arrest is not sufficient to say that Drew was ever put on notice that he was arrested for this offense. And with that, Your Honors, I respectfully would maintain all my arguments and my briefs, and on behalf of Mr. Drew, I appreciate the time and consideration you've given to his case. We notice that you are a CJA appointment, and we want to thank you, because having good people on both sides to argue and to press through a case really helps the court, and we can't do that without people who are willing to serve in the CJA capacity, and we thank you. Thank you, Your Honors. And thank you both for briefing and strong advocacy. The case will be taken under advisement.